**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHAD YEARWOOD,
*on behalf of himself, FLSA Collective Plaintiffs, and the Class,*
Plaintiff,

v.

BOWERY RESIDENTS' COMMITTEE, INC.,
d/b/a BRC,
Defendant.

Case No.: 1:26-cv-00581-LJL

**FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT**

Jury Trial Demanded

Plaintiff, CHAD YEARWOOD (hereinafter, "Plaintiff YEARWOOD"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this First Amended Collective and Class Action Complaint against Defendant, BOWERY RESIDENTS' COMMITTEE, INC. ("BRC" or "Corporate Defendant" or "Defendant") and states as follows:

## INTRODUCTION

1. Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§201 *et. seq.* ("FLSA"), that Plaintiff, FLSA Collective Plaintiffs, and similarly situated individuals are entitled to recover from Defendant: (1) unpaid wages, including unpaid overtime, due to time shaving, (2) liquidated damages, and (3) attorneys' fees and costs.

2. Plaintiff further alleges that, pursuant to the New York Labor Law ("NYLL"), he and others similarly situated are entitled to recover from Defendant: (1) unpaid wages, including overtime, due to time-shaving, (2) statutory penalties, (3) liquidated damages, and (4) attorneys' fees and costs.

3. Plaintiff alleges, on an individual basis, pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"), and the New York City Human Rights Law,

Administrative Code of the City of New York § 8-107 ("NYCHRL"), due to the deprivation of his statutory rights as the result of Defendant's discrimination based on his race, and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331 (Federal Question Doctrine) and 1337 (Regulation of Commerce), and 1343 (Civil Rights), and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

4. Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

## PARTIES

5. Plaintiff CHAD YEARWOOD is a resident of Bronx County, New York.

6. Corporate Defendant BOWERY RESIDENTS' COMMITTEE, INC. is a 501(c)(3) nonprofit organization which provides homeless outreach services, transitional housing and shelter, permanent housing, and substance abuse treatment. Corporate Defendant is organized under the laws of the State of New York and authorized to do business in the State of New York, with headquarters at 131 West 25th Street, New York, NY 10001.

7. Corporate Defendant BOWERY RESIDENTS' COMMITTEE, INC. operates shelters and residences across New York City, including at the following locations:

(a) Assessment Center, 146 Clay Street, Brooklyn, NY 11222

(b) Parkview Residence, 161 Lexington Avenue, New York, NY 10016

(c) Jack Ryan Residence, 127 West 25th Street, New York, NY 10001

(d) Lexington Avenue Men's Residence, 85 Lexington Avenue, Brooklyn, NY 11238

(e) Palace Employment Residence, 315 Bowery, New York, NY 10003

(f) Reaching New Heights Residence, 237 Landing Road, Bronx, NY 10468

(g) Beaver Pond Residence, 170-01 Douglas Avenue, Jamaica, NY 11433

(h) Blue Sky Residence, 112-116 Astoria Boulevard, Astoria, NY 11433

(i) Bowery Safe Haven, 317 Bowery, New York, NY 10003

(j) Reception Center, 127 West 25th Street, New York, NY 10001

(k) Lex Safe Haven, 566 West 182nd Street, New York, NY 10033

(l) Casa de Los Vecinos, 91 Pitt Street, New York, NY 10002

(m) Cecil Ivory House, 149 West 132nd Street, New York, NY 10027

(n) Fulton House, 2570 Fulton Street, Brooklyn, NY 11207.

(o) Robert C. Wood Apartments, 18-26 Redfern Avenue, Far Rockaway, NY 11691

(Collectively, with any locations and/or shelters not listed above, the "Locations").

8. Defendant BOWERY RESIDENTS' COMMITTEE, INC.'s headquarters office is located at 131 West 25th Street, New York, NY 10001. Due the nature of Defendant's services, Plaintiff, FLSA Collective Plaintiffs, and Class Members perform work under Defendant's directions at any of Defendant's Locations.

9. All above mentioned Locations operate with common payroll, common management, and common executive control under the control of BRC and its board of directors. *See* **Exhibit C**.

(a) Corporate Defendant BOWERY RESIDENTS' COMMITTEE, INC. operates at least eight (8) shelters and assistance centers in New York all of which are under the control of BOWERY RESIDENTS' COMMITTEE, INC., as detailed in **Exhibit A** (BRC's Website Detailing BRC Locations).

(b) Corporate Defendant BOWERY RESIDENTS' COMMITTEE, INC. is listed as an approved entity on the New York State Education Department ("SED") Office of the Professions. **Exhibit B** (NYS Ed. Dept. Office of all Professions Listing of BRC as an Approved Entity)

(c) Regardless of the location at which they work, all individuals and employees are directed to contact Defendant's Human Resources through the same email address. *See* **Exhibit C** (BRC Contact Listing). Regardless of the location at which they work, all individuals and employees are directed to contact the same Volunteer coordinator. *Id.*

(d) All of BRC's locations advertise open job positions together on Defendant's website https://myjobs.adp.com/brc/cx, which is found by way of https://www.brc.org/jobs. The career page lists all locations alongside one another. *See* **Exhibit D** (BRC Career Page). Defendant's common career page shows that all of the locations have a centralized Human Resources that deals with hiring, firing, and administering all the locations' workforce. *Id.*

(e) BRC operates a single Instagram page for all of its locations and more than thirty (30) programs. *See* **Exhibit E** (Defendant's Instagram Page). Corporate Defendant BOWERY RESIDENTS' COMMITTEE, INC. advertises all the Locations (e.g. shelters' and/or assistance centers' locations) on its shared social media. *Id.*

(f) Plaintiff and other employees were freely transferred from one Location to another in order to fulfill Defendant's interests.

(g) Defendant's Form 990 shows Defendant had 1,924 employees in 2023. *See* **Exhibit F** (BRC's 2023 Tax Filing).

(h) Defendant manages and administers all locations' payroll, payments, and wage policies. For example, Defendant advertises that regardless of location, all full-time employees are offered flexible spending accounts (FSAs) through the same program. *See* **Exhibit G** (Description of Job Duties and Benefits Published by Shared HR)**.**

10. At all relevant times, Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, NYLL, and the regulations thereunder.

11. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendant.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

12. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt employees (including, but not limited to, housing specialists, social workers, case managers, counselors, assistants, drivers, porters, nurses, receptionists, aides, custodians, and security guards) employed by Defendant on or after

the date that is six years before the filing of the Complaint in this case (herein, "FLSA Collective Plaintiffs").

13. At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendant's decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them their proper wages, including overtime, due to a policy of time-shaving. The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs.

14. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to §16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from the Defendant. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendant.

**RULE 23 CLASS ALLEGATIONS**

15. Plaintiff brings claims for relief pursuant to Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt employees (including, but not limited to, housing specialists, social workers, case managers, counselors, assistants, drivers, porters, nurses, receptionists, aides, custodians, and security guards) employed by Defendant on or after the date that is six years before the filing of the Complaint in this case (the "Class Period").

16. All said persons, including Plaintiff, are referred to herein as the "Class". The Class Members are readily ascertainable. The number and identity of the Class Members are able to be determined from the records of Defendant. The hours assigned and worked, the position

held, and rates of pay for each Class Member are also able to be determined from Defendant's records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided by means permissible under F.R.C.P 23.

17. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number presently rest are within the sole control of Defendant. There is no doubt that there are more than forty (40) members of the Class. Plaintiff YEARWOOD is a member of the Class he seeks to represent.

18. Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief that would be sought by each member of the Class in separate actions. All the Class Members were subject to the same corporate practices of Defendant of failing to: (i) compensate wages, including overtime, due to time-shaving, (ii) provide proper wage statements per requirements of the NYLL, and (iii) properly provide wage notices to Class Members, at the date of hiring and annually thereafter, per requirements of the NYLL.

19. Defendant's corporate-wide policies and practices affected all Class Members similarly, and Defendant benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies practices, and procedures.

20. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interest antagonistic to the Class. Plaintiff is represented by attorneys who are experienced

and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

21. A class action is superior to other available methods for the fair and efficient adjudication of the controversy—particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual Class, members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendant and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

22. Defendant and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

23. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members, including:

a) Whether Defendant employed Plaintiff and the Class within the meaning of New York law and applicable state laws;

b) What are and were the policies, practices, programs, procedures, protocols, and plans of Defendant regarding the types of work and labor for which Defendant did not pay Plaintiff and Class Members properly;

c) At what common rate, or rates subject to common methods of calculation, were and are Defendant required to pay Plaintiff and Class Members for their work;

d) Whether Defendant properly notified Plaintiff and Class Members of their hourly rates and overtime rates;

e) Whether Defendant properly compensated Plaintiff and Class Members for all hours worked;

f) Whether Defendant mandated the same and/or similar clock-in and/or timekeeping procedures for Plaintiff and Class Members;

g) Whether Defendant operated their business with a policy of failing to pay Plaintiff and Class Members for all their hours worked due to a policy of time-shaving;

h) Whether Defendant provided proper wage statements informing employees of information required to be provided on wage statements as required under the NYLL and applicable state laws; and

i) Whether Defendant provided proper wage and hour notice to employees, including, among other things, the rate of compensation, trade name of employer, pursuant to the requirements of the NYLL and applicable laws.

**STATEMENT OF FACTS**

24. In or around February 2024, Plaintiff CHAD YEARWOOD was hired by Defendant to work as a Porter and Driver for all Defendant's BRC Locations. Plaintiff's employment with Defendant terminated on May 19, 2025.

25. During his employment with Defendant, Plaintiff YEARWOOD's duties were to travel between any and all BRC Locations, pick up clients, drop them off clients to specific shelters, carry clients' possessions for them, and take clients to medical appointments.

26. During his entire employment with Defendant, Plaintiff YEARWOOD was compensated at a rate from $18.00 an hour.

*Plaintiff's and Class Members' Timeshaving Claims*

27. At all relevant times, Defendant failed to compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members their proper wages for all hours they worked, due to Defendant's policy of time shaving, in violation of the FLSA and the NYLL.

28. Throughout his employment, Plaintiff was regularly scheduled to work five (5) days per week, from Sundays to Thursdays from 7:00 a.m. to 3:30 p.m. with an unpaid one (1) hour break. Because Plaintiff worked through all meal breaks, Plaintiff worked for a total of forty-two and a half (42.5) hours per week. Throughout his employment, Plaintiff would work his scheduled hours and then work hours beyond his schedule that would go uncompensated.

29. Similarly, FLSA Collective Plaintiffs and Class Members would work their scheduled hours, and then work hours beyond their schedules, which went uncompensated.

30. Defendant regularly directed Plaintiff to clock out for lunch and required him to work through his meal breaks. As Defendant only compensated Plaintiff for hours on the clock,

Plaintiff was not paid for the meal breaks he worked through. Similarly, FLSA Collective Plaintiffs and Class Members also worked through meals.

31. At all relevant times, FLSA Collective Plaintiffs and Class Members were similarly subjected to the same time shaving policies and required by Defendant to engage in unpaid labor on a daily basis without any compensation.

32. During Plaintiff's employment, Defendant failed to compensate Plaintiff for all his worked hours. Plaintiff YEARWOOD would frequently clock in fifteen (15) to thirty (30) minutes before his scheduled shift and leave five (5) to ten (10) minutes after his scheduled shift. However, he was not paid for the pre-and-post-shift time. Similarly, FLSA Collective Plaintiffs and Class Members were not paid for all hours worked.

33. When employees like Plaintiff would request their timesheets to verify their hours, Defendant would only produce altered payroll times to mislead employees.

34. Defendant would alter Plaintiff's, FLSA Collective Plaintiffs' and Class Members' timesheets to reduce their compensable time and would thereby fail to pay them for all hours.

35. As an example, Defendant supplied Plaintiff with his supposed clock-ins for the weeks of May 5, 2024, to May 16, 2024, which Plaintiff details below:

| **Date** | **Clock-In** | **Clock-Out** | **Clock-in** | **Clock-Out** | **Time-In (hrs:min)** |
|---|---|---|---|---|---|
| 05/05/24 | 7:00 AM | 12:46 PM | 1:46 PM | 3:30 PM | 7:30 |
| 05/06/24 | 7:00 AM | 11:17 AM | 12:17 PM | 3:30 PM | 7:30 |
| 05/07/24 | 7:00 AM | 11:20 AM | 12:20 PM | 3:30 PM | 7:30 |
| 05/08/24 | 7:00 AM | 11:30 AM | 12:30 PM | 3:30 PM | 7:30 |
| 05/09/24 | 12:00 PM | 3:30 PM | 7:00 PM | 11:00 PM | 7:30 |
| 05/10/24 | | | | | |
| 05/11/24 | | | | | |
| 05/12/24 | 7:00 AM | 11:00 AM | 12:00 PM | 3:30 PM | 7:30 |
| 05/13/24 | 7:00 AM | 11:00 AM | 12:00 PM | 3:30 PM | 7:30 |
| 05/14/24 | 7:00 AM | 11:00 AM | 12:00 PM | 3:30 PM | 7:30 |
| 05/15/24 | 7:00 AM | 11:00 AM | 12:00 PM | 3:30 PM | 7:30 |

| | | | | | |
|---|---|---|---|---|---|
| 05/16/24 | 7:00 AM | 11:12 AM | 12:12 PM | 3:30 PM | 7:30 |

36. Over this two-week period, Plaintiff's supposed clock in times match his start time *to the minute*, match his end time *to the minute*, and show that he clocked out for exactly a one (1) hour meal break again, *to the minute*. This robotic perfection was only possible as Defendant frequently alter Plaintiff's, FLSA Collective Plaintiffs', and Class Members' timesheets to their detriment and without their knowledge.

37. Defendant's unlawful conduct resulted in unpaid overtime for, among others, the following weeks: (i) the week ending on May 3, 2024, (ii) the week ending on May 23, 2024, (iii) the week ending on April 11, 2025, and (iv) the week ending on November 24, 2024.

38. At all relevant times, Defendant knowingly and willfully operated their business with a policy of failing to pay wages to Plaintiffs, FLSA Collective Plaintiffs, and Class Members for all hours they worked, due to Defendant's policy of time shaving, in violation of the FLSA and the NYLL.

*Plaintiff's and Class Members' Log-in Time Claims*

39. At all BRC locations, employees are required to clock in through a web-based portal on their desktop computers rather than through a standalone timekeeping system. Before an employee can record their start time, they must complete a multi-step login process: connecting to Defendants' VPN, opening an internet browser, navigating to and loading ADP's website, logging in with their ADP credentials, and then locating and loading ADP's timekeeping page.

40. Because employees cannot clock in until this entire process is complete, they are unable to record their time immediately upon arriving at work. Logging into both Defendant's

VPN and ADP's portal takes three to five minutes under normal conditions — and frequently longer when computers are slow or freeze entirely.

41. Defendant's rounding policy compounds this problem. Because the time spent completing the login process each morning and afternoon is systematically excluded from employees' compensable time, Defendant's rounding practices operate in a manner that is non-neutral and consistently favors Defendant over employees.

42. As a result of Defendant's timekeeping and rounding policies, Plaintiff, the FLSA Collective Plaintiffs, and Class Members are time-shaved approximately 30 minutes to an hour each week, as they are required to perform work off the clock—without compensation—before they are able to record their arrival, which will then be rounded non-neutrally and to the employee's detriment.

*Claims of WTPA Violations*

43. At all relevant times, Plaintiff and Class Members never received a wage notice from Defendant.

44. At all relevant times, Plaintiff and Class Members did not receive proper wage statements from Defendant.

45. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL— Defendant knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendant.

46. In failing to provide proper wage statements and notices, Defendant has failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs*., 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

47. Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendant's conduct actually harmed Plaintiff and Class Members. Defendant's failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendant's ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendant's failure to provide wage notices and wage statements to employees allowed Defendant to hide their responsibility and deprive employees of timely compensation.

48. Had Defendant provided to Plaintiff and Class Members proper wage statements, as required by law, Defendant would have had to forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the wages that the employee actually earned. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

49. The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

50. The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the Plaintiffs earned $ 133,086 as reflected on his final year paystub and W-2").[1]

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *real check stubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

51. The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co*., 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

52. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

53. Here, it is clear that Defendant's failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the wages been accurately reported for a given pay period, Defendant's

automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendant submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

54. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id.* at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id.* Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id.* "[T]he Plaintiffs' real interest lies in ensuring that the [employer] make the proper reports of their income." *Id.*

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

55. The case at bar is somewhat different from *Coward* inasmuch as Defendant actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id.* Plaintiff and Class Members lost benefits by virtue of how Defendant reported their income, and how Defendant reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "[p]laintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

56. Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

57. The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

58. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendant *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was irreversibly injured with respect to their social security benefits as soon as Defendant sent their W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

59. At no time during the relevant periods did Defendant provide Plaintiff or Class Members with proper wage notices, at the beginning of their employment and annually thereafter as required by the NYLL.

60. Defendant knowingly and willfully operated their business with a policy of not providing proper wage notices, at the beginning of employment and annually thereafter, pursuant to the requirements of the NYLL.

61. Defendant failed to provide Plaintiff and Class Members with proper wage statements because they failed to accurately reflect the employees' hours worked due to Defendant's policy of time shaving.

62. Defendant knowingly and willfully operated their business with a policy of not providing proper wage statements as required by the NYLL.

63. Defendant knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

*Plaintiff's Individual Discrimination Claims*

64. Plaintiff is a black male.

65. Manager Jim Pasmino regularly mocked Plaintiff, making racially derogatory remarks such as "Why do black people like being in jail so much?" and "Why do you keep looking at my pockets?"

66. Manager Jim Pasmino further threatened Plaintiff based on harmful stereotypes characterizing dark-skinned black men as inherently violent and aggressive. Throughout his employment with Defendant, Jim Pasmino often threatened to fight and beat up Plaintiff after his shift.

67. Defendant's discriminatory conduct herein was clearly motivated by Plaintiff's race and color. Any other explanation Defendant might provide is clearly pretextual.

68. At all relevant times, Defendant knowingly and subjected Plaintiff to inferior terms, conditions, and privileges of employment, in violation of the NYSHRL and NYCHRL.

69. As a result of Defendant's discriminatory conduct, Plaintiff suffered from emotional distress and humiliation.

70. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiffs, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

71. Plaintiff realleges and reavers the above paragraphs of this Complaint as if fully set forth herein.

72. At all relevant times, Defendant was and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

73. At all relevant times, Defendant employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

74. At all relevant times, Corporate Defendant had gross annual revenues in excess of $500,000.

75. The fact that Corporate Defendant's gross yearly revenues exceed $500,000.00 can be inferred from Defendant's PPP Loans. PPP loans were generally calculated at approximately 2.5 times a company's average monthly employee payroll costs for either (a) the year leading up to the date of the loan or (b) calendar year 2019. The Pandemic Response Accountability Committee, an official United States government oversight committee, provides information regarding companies' PPP loans on their website, https://www.pandemicoversight.gov.

76. Defendant was granted loan in the amount of $9,779,820, with estimated yearly payroll costs of $9,779,820 for 500 jobs reported.

77. At all relevant times, Defendant had a policy and practice of time-shaving that failed to pay Plaintiff and FLSA Collective Plaintiffs for all hours worked, including overtime compensation.

78. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendant. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

79. Defendant knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their proper overtime premiums, when Defendant knew or should have known such was due.

80. Defendant failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

81. As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

82. Due to the intentional, willful, and unlawful acts of Defendant, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid wages and unpaid overtime, plus an equal amount as liquidated damages.

83. Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**COUNT II**

**VIOLATION OF THE NEW YORK LABOR LAW**

84. Plaintiff realleges and reavers the above paragraphs as if fully set forth herein.

85. At all relevant times, Plaintiff and Class Members were employed by the Defendant within the meaning of the New York Labor Law, §§2 and 651.

86. Defendant knowingly and willfully violated Plaintiff's and Class Members' rights by failing to pay them wages in the lawful amount for all hours worked due to a policy of time-shaving.

87. Defendant knowingly and willfully operated their business with a policy of not providing Plaintiff and Class Members proper wage notices, at date of hiring and annually thereafter, as required under the NYLL.

88. Defendant knowingly and willfully operated their business with a policy of not providing proper wage statements, as required under the NYLL.

89. Due to Defendant's NYLL violations, Plaintiff and Class Members are entitled to recover from Defendant unpaid wages due to time-shaving, reasonable attorneys' fees, liquidated

damages, statutory penalties, and costs and disbursements of the action, pursuant to the NYLL.

## COUNT III

## DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
**(N.Y. Exec. Law 292, et seq.)**
**(Plaintiff's Individual Claims)**

90. Plaintiff realleges and reavers all the above allegations as if fully set forth herein.

91. The New York State Executive Law (1)(a) provides that:

"1. It shall be an unlawful discriminatory practice:

> (i) For an employer or licensing agency, because of an individual's […] race, […] color, national origin […] to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

92. Defendant violated the NYSHRL when they discriminated against Plaintiff on the basis of his race and color.

93. Not only did Defendant do nothing to abate or prevent the discrimination suffered by Plaintiff, their upper management condoned and participated in such practices, including but not limited to: (i) making derogatory remarks towards Plaintiff on the basis of his race and color; and (ii) threatening violence towards Plaintiff out of racial animus.

94. This discrimination conduct was in willful disregard of the provisions of the NYSHRL.

95. As a direct and proximate result of Defendant's willful disregard of the NYSHRL, Plaintiff suffered damages. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT IV

## DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

**(N.Y.C. Admin. Code. § 8-101, et seq.)**
**(Plaintiff's Individual Claim**

96. Plaintiff realleges and reavers all the above allegations as if fully set forth herein.

97. The New York City Administrative Code §8-107(1)(a) provides that:

> "1. It shall be an unlawful discriminatory practice:
>
> (a) For an employer or an employee or agent thereof, because of the actual or perceive […] race, […] color, national origin […] of any person:
>
> (1) To represent that any employment or position is not available when in fact it is available;
>
> (2) To refuse to hire or employ or to bar or to discharge from employment such person; or
>
> (3) To discriminate against such person in compensation or in terms, conditions, or privileges of employment.

98. Defendant violated the NYCHRL when they discriminated against Plaintiff based on his race and color.

99. Not only did Defendant do nothing to abate or prevent the discrimination suffered by Plaintiff, their upper management condoned and participated in such practices, including but not limited to: (i) making derogatory remarks towards Plaintiff on the basis of his race and color; and (ii) threatening violence towards Plaintiff out of racial animus.

100. This discriminatory conduct was in willful disregard of the provisions of the NYCHRL.

101. As a direct and proximate result of Defendant's willful disregard of the NYCHRL, Plaintiff suffered damages. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class Members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the Federal Labor Standards Act and New York Labor Law;

b. An injunction against Defendant and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

c. An award of unpaid compensation, including overtime, due to Defendant's policy of time-shaving;

d. An award of statutory penalties, prejudgment, and post judgment interest, costs and expenses of this action together with reasonable attorneys' and expert fees;

e. An award of compensatory and punitive damages due under the NYSHRL and the NYCHRL;

f. Designation of this action as a class action pursuant to sections 901 and 902 of the C.P.L.R.;

g. Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

h. Designations of Plaintiff as Representative of the Class; and

i. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and the Class, demands a trial by jury on all issues so triable as of right by jury.

Dated: April 17, 2026
New York, New York

Respectfully submitted,

By: */s/ C.K. Lee*

C.K. Lee, Esq.
**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, New York 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*